cases that everybody's here and ready to argue. So we'll begin with the argument on the first case, which is Boston Retirement System versus Telefonaktiebolaget. I got that completely wrong. That was the best I could do. Thanks. All right, and Mr. Canty, you haven't reserved any rebuttal time, so you can begin whenever you're ready. I've reserved two minutes for rebuttal, Your Honor. All right, great. Two minutes. Thank you. All right, go ahead. Good morning, Your Honors. And may it please the court, my name is Michael Canty, and I represent the plaintiff appellants in this action. With respect to the defendants, I'll be referring to them as Erickson. In 2019, Erickson entered into a deferred prosecution agreement with the government and made a series of misrepresentations that touted the finality of investigations into their corrupt practices. However, they made these statements fully aware that the investigation into Iraq had uncovered rampant bribery and payments to a known foreign terrorist organization, ISIS. Why was that important? Because in 2016, Erickson disclosed that it was under investigation by the Department of Justice and the SEC. And at that time, investors were rightly concerned. One analyst from Nordea Asset Management stated, quote, we take this very seriously. If this is a symptom of a bigger problem, it could cost a lot of money. We have to decide if we keep the share or sell. So when they made these statements in 2019, the defendants falsely assured investors that there were no existing- Mr. Canty, you know that the law is that they don't have to disclose, a company has no obligation to independently disclose misconduct, right? We've said that. Yes, Your Honor. And on this earnings call, they point out that, especially if you look at the prior question, that it relates not to some type of internal investigation, but to any government investigation. There's reference to any, in terms of any potential for other jurisdictions to look into this. And then in the second question, have you had any kind of discussions with the regulators? So their argument is that that was not a question about, does the company have any ongoing investigations? Does the government have any ongoing investigations? So why was that false or misleading? Your Honor, we believe that the district court took too thin a read with respect to that question. And regardless of whether or not you read that question as only detailing investigations by regulators or an internal investigation, we still submit that it's false. And why is it false? It's false because at the time, they knew of the content of the investigation. They had had conversations, according to the defendants, with regulators. They claimed that they disclosed it some two weeks before they entered into the deferred prosecution agreement. And they were fully aware of that information. This is not a right of confession. We've not argued that they have to confess that they knew about this, but they spoke on the issue. And we have to look at the context and the content of their statements. Since 2016, investors were rightly concerned. In terms of the statements, weren't there numerous warnings, indications that they were trying and there were still problems? Your Honor, they mean... In other words, I don't know that a reasonable investor would have been misled into believing that things were hunky-dory. The district court found that we were arguing that there were promises of future compliance, and that's not what we argue. Here, Erickson disclosed those generic risks of potential noncompliance and talked in detail about the implementation of these anti-corruption measures to reassure investors that there were no additional known corruption to be concerned with at the time. They did talk about mitigation for future risk, but the risk had already happened. I mean, the DPA provided for a monitor. Clearly, there were questions, concerns about compliance. Does that suggest that they weren't promising perfect compliance or guaranteeing that there had been perfect compliance? There's a distinction with your question, Your Honor. With respect to the first part, we're not arguing that they were promising future compliance. What we're arguing is that they had known facts. As this court stated in the Roebuck case, this is essentially the walking companion analogy, where warning a walking companion that there's a ditch in the road to be careful when they know that the Grand Canyon is a foot away is misleading. And here, it's even worse. The hiking companion has fallen into the Grand Canyon. But was the Iraq information generated other than through the internal investigation? Generated for, with respect to whom, the company? Yes. The company, we submit that the company knew about that conduct through other sources. So, for example, just the fact that they were working in Iraq. The conduct that was going on in Iraq at the time was known to the world. And there were risks involved with working in Iraq. Their general counsel- Doesn't that cut both ways? I mean, reasonable investors knew that they were in Iraq. Right, I think working in Iraq would mean that there were dangers, that there was exposure to having risks of employees being exposed to ISIS. Not that we expected them to bribe a known foreign terrorist organization to get access to speedway routes and to work around the Iraqi government. The distinction here between the cases that talk about future compliance is that this had already occurred. And to Your Honor's question with respect, wasn't there a monitor? Weren't there reporting requirements? Yes, there were. That's what makes it even worse. They knew about this conduct two weeks before. And Defendant Eckholm's admission that he knew about the conclusion of the investigation and it didn't rise to the level of materiality that needed to be disclosed clearly indicates that the report was finished. We're not talking about a report in its infancy. This was something that was known to them in full. But how do you get around the case law that says, even if they were aware of the conduct, they don't have a duty to disclose it independently. They can't lie about it if they're asked about it, but they have no independent duty to volunteer that information to investors. How do you get around that? The statements that they made, what we've described as the FCPA statements, these are statements made after they entered into the deferred prosecution agreement. Which one did they say, we have no investigations? The statement that this settlement puts an end to a long and wide-ranging process. And while the events described in the settlement are totally unacceptable, I'm glad that we finally reached this day. We're now able to move forward. That was true at the time. Because DOJ, it's not as if DOJ told them, we're looking into Iraq, that there was some outstanding government investigation at the time they made that statement. But their understanding was, as far as the government was concerned, it was over. Well, that was because they hadn't properly disclosed the information as required to. The securities laws don't allow companies to essentially skirt requirements and then go out to the public and say, all is fine. They knew with certainty that if this had been properly disclosed, and it had been concluded, the investigation two weeks before, that it almost certainly would have been a risk. And that's what makes this so troubling, because the only people that had that information- How did they know at that time of that press release that that had to be disclosed? Their position is, I guess going to see enter, that they didn't have the full information, that they knew there was conduct in Iraq, but whether or not it had to be disclosed under the DPA at the time of that press release, they were not aware of that, because outside counsel didn't provide them with all the details. Well, Your Honor, respectfully, they admitted that they had the full information and also outside counsel. The quote was that they and their outside counsel had that information. And that's what's equally troubling. Information is different than this is an FCPA violation, right? Well, if you look at the conduct that's alleged and that was disclosed, I think common sense and logic dictate that this was certainly, and it ultimately did lead to a violation. And we're talking about conduct that was far worse than the conduct for which they entered into the deferred prosecution agreement. Talking about paying bribes to a known foreign terrorist organization that was at odds with the United States. And they knew about that. There was allegations of a kidnapping of a third-party employee, a contractor that was working on behest of Erickson. So when we look at the substance of the conduct, it's illogical to say that they didn't think, or this certainly wouldn't have led to a violation of the deferred prosecution agreement. Okay. Assume arguendo that this statement we're talking about was misleading. What's your, what are your allegations of science? Thank you, Your Honor. I see my time is, anybody I'd like to answer the question. With respect to the Foreign Corrupt Practices Act statements the answer is very clear. It's the admissions of the defendants. We know that Ekhom stated that he knew as early as 2018 about the conduct in Iraq and said the materiality of our findings did not pass our threshold to make the disclosure. He then went on to say that was our judgment when we completed the investigation two years ago. So that's specific information that he had that the investigation was completed, that all the allegations as laid out in the complaint he was aware of and still found that it was not material. Now that may be the case, but it certainly establishes scienter. Secondly, the admission that in their plea agreement back in 2023, they said that they were aware  that they and their outside counsel had full knowledge of the investigation and that their outside counsel provided information that omitted essentially material information with respect to the report to the Department of Justice. All of that clearly indicates, along with all the other scienter allegations that we've outlined in our complaint, the area in which they were working in, the CWs reporting up to the highest levels of the company and specifically the dangers of working in Iraq. All right, thank you, Mr. Cantor. Thank you. We'll now hear from Mr. Jaffer. Good morning, Robert Jaffer for Erickson. May it please the court. This court should apply settled Second Circuit precedent and affirm Judge Kutz's well-reasoned decision. What the plaintiff does here is take snippets of disclosures and ignore all the other disclosures that the company made. Judge Chin had it exactly right. This company repeatedly warned investors, starting with in 2016, when it warned and said, we have a major FCPA investigation. There were fires burning, to use the plaintiff's expression. So if you compare this case to a case like Jinko Solar, where the Second Circuit reversed the grant of a motion to dismiss there, the company had told Chinese regulators that we have an environmental violation and basically painted a picture of perfection in terms of its environmental compliance. In another case, Noto, the company claimed that it fixed its accounting problems and denied there was an SEC investigation into those very subjects. In this case, the company repeatedly warned that it was operating in high-risk companies. Now, in 2019, the company entered into a DPA. That DPA covered five countries, Djibouti, China, Vietnam, Indonesia, and Kuwait. Post-DPA, the company expressly warned, and I direct the court to JA 599, that the DOJ could investigate facts that were not covered by the DPA, which covered five countries. Or the argument is at the time, the defendants knew that there was stuff going on in Iraq, and that therefore, that kind of equivocal disclosure wasn't adequate. How do you respond to that? It was perfectly adequate, because as Judge Bianco correctly said, this court in the UBS case 10 years ago you only have an obligation to disclose charged or adjudicated wrongdoing, not potential violations. Now, the other side- The difference would be, here there was a DPA, and Mr. Ducanti's point is, because there's a DPA in place that requires the company to affirmatively disclose this type of conduct to the government, that if you're sitting on that conduct, and you know it's gonna be disclosed, then you know there's gonna be a government investigation, because you're gonna have to disclose that to the government, and of course, they're gonna open up an investigation. So that would be the only distinguishing feature of this case versus all the other cases, the existence of the DPA. So why doesn't that make a difference? It makes a big difference here, because there was no conclusion in the internal investigation. There had actually been violations in Iraq. What the plaintiff said to you- I'm sorry, say that there were- There was no conclusive conclusion that there had been an FCPA violation in Iraq, and if the court were to look, and the plaintiff relies upon the breach agreement that the government's breach statements, he would- I thought your position was that everybody, the entire world knew, sort of the entire investment community knew about all the difficulties in Iraq. No question about that, but the bigger point, though, is they make a big deal about an internal investigation. The internal investigation did not find a violation in Iraq. In fact, they found it most, according to the Justice Department, a potential violation, and the law clearly is that companies don't have an obligation to disclose potential violations. The reason why the Second Circuit longstanding rule about adjudicated or charged wrongdoing makes sense is because it's a workable, clear standard. Companies like Erickson, and Erickson disclosed, in fact, that it was conducting, that it had over 400 whistleblower complaints, including involving corruption allegations. This was disclosed in 2017, 2018, and on up. They were constantly investigating issues. I thought the company admitted that it should have disclosed that information under the DPA. Did the company admit that it rose to the level that it should have been disclosed under the DPA? The DPA had a much broader requirement. The DPA required the company to disclose anything. You may, anything that might be an issue. Right, so it didn't have to rise to the level of a violation, right? Correct. In order to be, so the argument is that there was enough there for the company to know that it had to be disclosed under the DPA, and that therefore there would be a government investigation so that when, you know, in the press release it says, you know, investigations, we put the investigations behind us, that they knew that that was not the way it was gonna play out. Respectfully, no. What the company did was exactly right. The investigation that the company settled involved five countries. If you look at the DPA itself, and this is at JA-131, the release that's given in the DPA only covers those five countries. At the very same time, the company said that it faced the risk of investigations involving other countries plus other jurisdictions, and the company expressly disclosed at page 599, JA-599 in its annual report and in other documents, including going back to before the DPA, that the company faced the risk of follow-on investigations. Well, what's a follow-on investigation? They were concerned about, and disclosed to investors, that investigators in Sweden, where the company is headquartered, or in any one of the five countries, might investigate the company. Plus, there might be investigations in countries other than the five countries that were covered by the DPA. And that was an express warning to investors. And so the rule that the other side is positing for here is that public companies have an obligation when they enter into a DPA to disclose every possible indication of potential wrongdoing, and that's what it is, potential wrongdoing. Even as we sit here today, the Department of Justice has never found that Erickson violated the FCPA in Iraq. And so the other side says, well, there's these knowing violations, and that's not true. Potential violations is different, because otherwise you would have a disclosure regime where a company would have to put out a press release every other week, particularly if you were one like Erickson that was investigating whistleblower complaints literally on an ongoing basis. You'd be putting out disclosures to your investors. And the bright line rule that the Second Circuit had announced in the UBS case of charged or adjudicated wrongdoing is something you have to disclose. Makes sense. It's a workable rule. And what the other side is proposing here is something that's not workable. Now, on the question of Scienter, which was raised, it's very important to recognize that with respect to the Iraq internal investigation, the Department of Justice, in its statement, when it found a breach, and the breach involved far more than the failure to disclose additional information about the Iraq information, in that statement of breach, and this is at 789 and 788, 788, 789, it said expressly that Erickson's leadership directed outside counsel to disclose the Iraq investigation to the Department of Justice two weeks before the DPA. And that outside counsel had not provided sufficient information. But as far as the senior executives were concerned, they clearly had directed outside counsel to disclose that information and further information. Including Iraq? Yes, sir. That's at 789 of the record. And the Department of Justice states that the outside counsel were directed by Erickson's leadership to disclose the Iraq investigation to the Justice Department, and outside counsel failed to do so. It's a sufficiently. So I think that answers your question about Scienter. Clearly, you can't have Scienter if you're telling your outside counsel to disclose fully the Iraq investigation to the Justice Department two weeks before the DPA, and outside counsel omits facts that the Justice Department finds should have been disclosed. Now, the company was found to have breached the DPA, which was a risk the company disclosed when it entered into the DPA because of the failures to produce certain documents. Counsel failed to produce certain documents and also didn't provide sufficient disclosure about Iraq. But that certainly should not be on the leadership of the company. So this is a case, clearly, where a public company tried to do the right thing. It was operating in war-torn jurisdictions, repeatedly disclosed to investors the fact of the investigations, the risks of the investigations, the risk of additional investigations. They disclosed that the DPA covered just five countries, not the world, and at that point disclosed to investors that it could face additional investigations. It's hard to see what else the company could have done. And again, what the plaintiff is advocating for here is a rule that would be contrary to this court's settled rule that public companies do not have an obligation to disclose uncharged wrongdoing. In the other cases, companies made literally false statements. So plaintiff cites the Petrobras case. In Petrobras, the company flatly denied that it engaged in bribery. In fact, it was sitting on the biggest bribery scandal in probably in public history. And so in this case, the company was transparent with its investors, disclosed the risks, and as Judge Koontz properly said, what the plaintiff is doing is ignoring all of the warnings that the company made were operating in countries where corruption risks are high. We may be found to breach the DPA. There may be follow-on investigations by the Department of Justice and other jurisdictions into the conduct, either this conduct or other conduct. So what the plaintiff is ultimately saying here is there was, and I think this is important, he said just now that the internal investigation found rampant corruption and payments to ISIS. Not true. The Department of Justice in its basis for the breach said at 789 of the joint appendix, possible violations. To this day, there has never been a finding by the Department of Justice of FCPA violations in Iraq. One other thing, if I just could have a moment. It's important to remember that this company in 2008, in 2019 in September took a provision for a billion dollar charge to pay for the FCPA settlement. And the company at that point added a risk factor saying that well, beyond the costs of settling the Department of Justice investigation, the SEC investigation, we might have litigation and government investigations in other countries. We might have to take additional charges. So the analysts on that very day, the same analysts who then asked the question about Mr. De Dulden was focused on, well, what's the risk of other countries coming in and bringing follow-on investigations? So that statement of not being aware of follow-on investigations was not true. There were no follow-on investigations by other countries. And it was related to the risk that the company had disclosed and the company had in fact said that we face that risk of other investigations. Thank you, Mr. Jeffery. Thank you very much. Mr. Canty. You have two minutes. Thank you, Your Honor. With respect to the finding that there has to be a finding by the Department of Justice, that's not what we've alleged. We've alleged that they had to disclose the information that was known to them. So whether or not the Department of Justice ultimately found that there was a violation- You didn't say the information. What are you referring to? The information that we've laid out in our complaint is that they engaged in sham payments to government officials in Iraq, that they made bribery payments to individuals in Iraq within the government, that they made payments to ISIS to execute and expedite routes to set up the infrastructure outside of the agreements with the United States government and the Iraqi government. And that information was known to them. Moreover, the idea that they- So when, in the analyst call, when the question is, if you could give us an update on whether anything else has, or if you had any kind of discussions with the regulators, you think the response to not be misleading should be. We've had no discussions at all about any additional investigations with the regulators, but we have this internal investigation and we're looking into Iraq and we're gonna have to figure out that that is what they had to do in response to that question? Or they could have said nothing. In fact, that's what they did when it was ultimately disclosed. They said, we have no further comment on that issue at this time. Well, at that point, did they have any obligation to disclose information that was being generated through the internal investigation? Well, it's interesting because defense counsel said that it's not their fault, that essentially their outside lawyer, Simpson Thatcher, failed to provide sufficient information to the government. So they're claiming that they did make a disclosure as required under the DPA, but it was not sufficient. What's equal to- Putting aside obligations they may have had under the DPA, did they have any wider obligations in your view to disclose troubling information concerning Iraq that the internal investigation may have been generated? Yes, because they spoke on the issue. And Jake O'Sullivan says, you don't have a right of confession, but when you decide to tout these anti-corruption mitigation procedures you have in place, you go out and tell the market, it's all behind us. There's, of course there's risk, there's always future risk, but the investigations are behind us, there's nothing else. The investors were acutely aware of those issues and that's why they wanted the truth. By omitting the fact that there was information that was sitting on, explosive information, they misled investors. So what they admitted, I think we're talking about what, misstatement 11, I believe it is? That's about the follow-on, no follow-on investigation. So it's your position that the statement that was made that you're challenging was sufficiently capacious so that it carried along with it a requirement to talk about what was being found during, concerning Iraq during the internal investigation. Is that your position? That's correct. If you're going to speak on that, it sends a message to the market that there's nothing else out there. The context is key. It's material insofar as the fact that the questions are being asked. They want to know, we understand, investors say, we understand the risk of a future, the future risk, but is there anything now, going on now? I mean, your theory is, as we all know, I mean, this country, this company is doing business literally around the world. And these, and presumably, it's, you know, it's compliance and regulatory people are looking at problems coming up in lots of different countries and lots of different contexts. Under your theory, they have the extraordinary broad responsibilities of disclosure when they talk on this subject. I respectfully disagree insofar as that it's not that broad. It's when you speak on specific topics, you have to tell the whole truth. And the context is key here. The conduct here that we're talking about is the bribery of a known foreign terrorist organization. That's certainly material to investors. And in fact, when they found out about it, the one sitting analyst said, Erickson is virtually uninvestable at this point. So we're not talking about footfalls or minor regulatory infractions. We're talking about significant egregious behavior in light of the fact that they, from 2016 to the DPA, they laid out specific and articulable steps, actionable steps they took to try to mitigate that risk. They knew the information and they didn't disclose it. It was not a future potential risk. I see my time has expired. I would respectfully request that the court reverse the district court's decision. Thank you, Your Honor. Thank you, Mr. Canfield. We'll reserve decision. Have a good day.